UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

**FELDER'S COLLISION PARTS, INC.**

                                                                **CIVIL ACTION**

**VERSUS**

                                                 **NO. 12-646-JJB**

**GENERAL MOTORS COMPANY ET AL.**

**<u>RULING ON DEFENDANTS' MOTION TO DISMISS</u>**

      This matter is before the Court on a Motion to Dismiss (Doc. 22) pursuant to Federal Rule of Civil Procedure 12(b)(6), filed by Defendants General Motors LLC[1] ("GM"), All Star Advertising Agency, Inc., All Star Chevrolet North, L.L.C., and All Star Chevrolet, Inc. (the All Star Defendants are referred to as "All Star"). Plaintiff, Felder's Collision Parts, Inc. ("Felder's"), has filed an opposition (Doc. 25), to which Defendants have filed a reply (Doc. 28). In opposition, Felder's has requested leave to amend any allegations that this Court deems insufficient. Oral argument is not necessary. The Court's jurisdiction exists pursuant to 28 U.S.C. § 1331. For the reasons herein, the Defendants' Motion to Dismiss (Doc. 22) is DENIED, and Plaintiff's request for leave to amend (Doc. 25 at 22-23) is GRANTED.

I.

      Felder's brought this action pursuant to the Robinson-Patman Act ("RPA"), 15 U.S.C. § 13, the Sherman Act, 15 U.S.C. § 2, the Louisiana Unfair Trade Practices and Consumer Protection Act ("LUTPA"), La. Rev. Stat. § 51;1401, *et seq.*, and several other Louisiana revised statutes, La. R.S. §§ 51:122, 123, 124, 137, and 422 (Doc. 1). Additionally, Felder's contends that GM, All Star, and John Doe Defendants 1-25 ("Doe Defendants") should be held jointly and severally liable for conspiring to aforementioned violations under La. Civ. Code art. 2324.

---

[1] Defendants assert that the Complaint incorrectly identifies General Motors LLC as General Motors Company.

Defendants' Motion to Dismiss is brought on the following grounds: (1) the claims are insufficiently pled, (2) the RPA claim must fail because Felder's does not allege price discrimination, (3) Felder's fails to state a predatory pricing claim because the allegations inadequately address relevant market(s), market power, and barriers to entry, (4) dismissal is appropriate because Felder's cannot establish below-cost pricing, (5) Felder's lacks antitrust standing, (6) the Louisiana antitrust claims must fall because the federal claims are deficient, (7) Felder's' other state law claims fail as a matter of law, and (8) Felder's impermissibly refers to the three All Star entities as "All Star."

The following facts are from the Complaint (Doc. 1) and are accepted as true for the purposes of this motion. *See Bass v. Stryker Corp.*, 669 F.3d 501, 507 (5th Cir. 2012). There are two types of automobile parts: original equipment manufacturer parts ("OEM parts"), which are produced by the manufacturer, and aftermarket parts, which are produced by other entities. All Star and the Doe Defendants sell OEM parts, specifically GM-compatible parts, to collision centers and body shops throughout southern Louisiana and southern Mississippi. Felder's operates in the same geographic area and at the same level of the distribution chain as All Star and Doe Defendants, but Felder's sells aftermarket parts. Aftermarket collision parts consist of approximately 20% of the automobile replacement party market and historically, have been sold for lower prices than their OEM counterparts.

In 2009, GM established a price incentive program called the "Bump the Competition" program, which offers "highly competitive pricing" on GM parts (Doc. 1, Ex. 1). As part of the program, GM created a "GM Collision Conquest Calculator," which Felder's alleges is a facilitating device for Defendants' conspiracy to resell OEM parts for a price below the average

variable cost ("AVC")[2] paid by dealers to GM for the parts. According to Felder's, Defendants' intention is to undercut aftermarket dealer prices in order to drive the aftermarket competition out of business.

Under the program, distributors, like All Star, may sell OEM parts at a "bottom line price," which is 33% lower than the price for the aftermarket equivalent, and then apply to GM for a rebate. The rebate enables dealers to collect the difference between the sale price and the cost paid to GM, plus an additional profit. Additionally, GM allegedly offers cash rebate cards to sales representatives to induce sales under the program's terms. The pricing program is available for 4,400 parts. According to Felder's, the pricing program has only been instituted with respect to OEM parts with a comparable aftermarket alternative. GM does not incentivize OEM dealers to sell parts without an aftermarket alternative at prices below cost. Ultimately, Felder's alleges that Defendants conduct is an unlawful attempt to obtain monopoly power.

Felder's provides several examples[3] to illustrate its assertion that Defendants are conspiring to obtain a monopoly by engaging in predatory pricing. For instance, GM offers to sell one particular OEM part for $135.01, which is normally listed by the dealer for $228.83. The comparable aftermarket part is listed for $179.00. Under the pricing program, an OEM dealer can sell the part for a "bottom line price," which is the aftermarket price less 33%. Here, the bottom line price is $119.93. After selling the part for $119.93, the dealer is entitled to a rebate from GM for the difference between the price paid for the part, $135.01, and the price for which the dealer sold the part, $119.93, plus an additional 14% profit, which is $18.90.

---

[2] As will be addressed, *infra*, AVC is the "appropriate measure of cost" for a predatory pricing claim under the prevailing Fifth Circuit standards. Since Felder's' Complaint incorrectly defines AVC, the formula offered in the Complaint is not included in the statement of facts in an attempt to minimize confusion.
[3] Although Felder's provides three examples of this pricing program, only one will be repeated here.

Felder's alleges that, in recent years, the pricing program has significantly impacted the sale of aftermarket parts throughout southern Louisiana and southern Mississippi. Felder's asserts that four of its competitors have already gone bankrupt due to the Defendants' conduct. Felder's also alleges that it has suffered a steady profit decline during the program's existence. In 2008, the last year before this program was implemented, Felder's had a total income in excess of $3 million. By 2011, Felder's' income had decreased by more than $1 million.

Felder's contends that All Star and Doe Defendants have a "reasonable prospect and/or dangerous probability of recouping any losses resulting from the sale of collision parts below AVC." (Doc. 1 at 9). Felder's contends that once the competition has been "bumped," Defendants will reap monopoly profits by ceasing to offer reduced prices on parts that currently have aftermarket alternatives. Defendants will be able to maintain these supracompetitive prices, according to Felder's, because "high and difficult" barriers to entry in the automobile parts industry will prevent new entrants from effectively competing with Defendants (Doc. 1 at 10).

## II.

Federal Rule of Civil Procedure 12(b)(6) provides for dismissal of a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). When reviewing the complaint, the court must accept all well-pleaded facts in the complaint as true. *C.C. Port, Ltd. v. Davis-Penn Mortg. Co.*, 61 F.3d 288, 289 (5th Cir. 1995). In order to survive a motion to dismiss, the complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

III.

**FEDERAL ANTITRUST CLAIMS**

Felder's has alleged that Defendants engaged in predatory pricing, thereby violating both the RPA and § 2 of the Sherman Act. Since the standards applicable under these acts are distinct, these claims will be addressed in turn.

To establish a claim under the RPA, a plaintiff must show: (1) sales made in interstate commerce; (2) the commodities sold were of like grade and quality; (3) the defendant-seller discriminated in price between buyers; and (4) that the price discrimination had a prohibited effect on competition. *Infusion Res., Inc. v. Minimed, Inc*., 351 F.3d 688, 692 (5th Cir. 2003). The complained-of injury[4] must flow from a defendant's acts of price discrimination, which is "merely a price difference." *Water Craft Management, L.L.C. v. Mercury Marine*, 361 F. Supp. 2d 518, 526 (M.D. La. 2004) (citing *Texaco Inc. v. Hasbrouck*, 496 U.S. 543, 559 (1990)). Price discrimination is "defined as charging different buyers different prices for the same items." *Id*.

Under § 2 of the Sherman Act, three broad categories of conduct are actionable: monopolization, attempted monopolization, and conspiracy to monopolize. The measure of proof for each is distinct. *See generally Vaughn Medical Equipment Repair Services, L.L.C., v. Jordan Reeses Supply Co.*, 2010 WL 3488244, at *9-10 (E.D. La. Aug. 26, 2010). To state a claim for *monopolization*, the plaintiff must allege that the defendant: (1) possesses monopoly power in the relevant market, and (2) willfully acquired or maintained that power. *Eastman Kodak Co. v. Image Tech Servs., Inc.*, 504 U.S. 451, 481 (1992). To state a claim for *attempted monopolization*, the plaintiff must allege that "(1) the defendant has engaged in predatory or

---

[4] Two basic types of injury are recognized under RPA: primary-line injury and secondary-line injury. *Infusion*, 351 F.3d at 692. A primary-line injury results when one seller's acts of price discrimination between favored and disfavored buyers results in an injury to a market player competing at the same level of direct competition. *Water Craft*, 361 F. Supp. 2d at 565. A secondary-line injury results from a seller's price discrimination between favored and disfavored buyers. *Infusion*, 351 F.3d at 692.

anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power" in the relevant market. *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993). Finally, to state a claim for *conspiracy to monopolize*, the plaintiff must allege: (1) specific intent to monopolize, (2) the existence of a combination or conspiracy to monopolize, (3) an overt act in furtherance of the combination or conspiracy, and (4) an effect upon a substantial portion of interstate commerce. *Stewart Glass & Mirror, Inc. v. U.S. Auto Glass Disc. Centers, Inc.*, 200 F.3d 307, 316 (5th Cir. 2000).

At the outset, the Court addresses two areas of ambiguity in the pleadings. First, the Complaint is unclear about whether Defendants have engaged in actual monopolization, an attempt to monopolize, or a conspiracy to monopolize.[5] Predatory pricing can serve as a basis for either actual monopolization or an attempt to monopolize. *See, e.g.*, *Stearns Airport Equipment Co., Inc. v. FMC Corp.*, 170 F.3d 518, 528 (5th Cir. 1999) (discussing plaintiff's actual monopolization claim based on predatory pricing); *Taylor Pub. Co. v. Jostens, Inc.*, 216 F.3d 465, 477-79 (5th Cir. 2000) (analyzing predatory pricing under first of three elements relative to plaintiffs claim for attempted monopolization). Notably, Defendants cite the elements for *attempted* monopolization, tailoring the analysis therein accordingly.[6] Confusing matters, Felder's' opposition cites to the same elements, but indicates that the elements relate to actual monopolization.[7] Despite the fact that Felder's' opposition refers to the attempted

---

[5] According to the Complaint, Defendants "have *colluded and conspired* to *and have engaged* in the below cost predatory pricing described herein *in an attempt* to monopolize the sale of collision repair parts in southern Louisiana and Mississippi." (Doc. 1 at 13).

[6] As Defendants state in their Motion to Dismiss, "To state an *attempt to monopolize* claim: a plaintiff must prove (1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." (Doc. 22-1 at 11).

[7] According to Felder's' opposition, "A claim for *monopolization* under the Sherman Act requires proof of (1) predatory or anti-competitive conduction; (2) specific intent to monopolize; and (3) dangerous probability of achieving monopoly power." (Doc. 25 at 10).

monopolization elements as the elements for actual monopolization, the analysis below treats Felder's' Sherman Act § 2 claim as an attempted monopolization claim.

Second, Felder's' arguments regarding the federal antitrust claims ignore key distinctions between the predatory pricing claims cognizable under the RPA and § 2 of the Sherman Act. It is true that predatory pricing is actionable under either statute. Indeed, "primary-line *injury* under the [RPA] is of the same general character as the *injury* inflicted by predatory pricing schemes actionable under § 2 of the Sherman Act." *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 221 (1993) (emphasis added). Nevertheless, there are fundamental distinctions between the *claims* that are cognizable under either statute,[8] which are outlined below.[9]

### A. <u>Robinson-Patman Act</u>

Under the RPA, a plaintiff must show that (1) sales were made in interstate commerce; (2) the commodities sold were of like grade and quality; (3) the defendant(s) engaged in price discrimination; and (4) this discrimination had an anticompetitive effect. *Infusion*, 351 F.3d at 692. Defendants argue that the Complaint fails to address the first three elements. However, the Complaint does support an inference that sales were made in interstate commerce. All Star is located in Louisiana and the Complaints refers to sales in both Louisiana and Mississippi. Any sale by All Star to a buyer in Mississippi involves interstate commerce.

As for the second element—commodities of like grade and quality—Felder's argues that the direct competition between aftermarket and OEM parts suggests that the goods are

---

[8] According to the Supreme Court, in *Brooke Group*:

> There are, to be sure, differences between the two statutes. For example, we interpret § 2 of the Sherman Act to condemn predatory pricing when it poses 'a dangerous probability of actual monopolization,' whereas the Robinson–Patman Act requires only that there be 'a reasonable possibility' of substantial injury to competition before its protections are triggered….

*Brooke Group*, 509 U.S. at 222 (citation omitted).

[9] For example, hiring away a competitor's employees may be unlawful under § 2 of the Sherman Act, *Taylor Pub.*, 216 F.3d at 480 n.11; but the lack of price discrimination renders the same not violative of the RPA.

reasonably interchangeable and, thus, of like grade and quality. Defendants counter that Felder's' argument is irrelevant to the second element. The Court agrees. The issue is not whether aftermarket parts are comparable to OEM parts. Rather, the question is whether Felder's alleged that Defendants sold goods of like quality to different buyers for different prices. *Supra* note 4; *see also Infusion*, 351 F.3d at 692 (asking whether goods sold to disfavored purchaser were comparable to goods sold to others). Since Felder's' allegations do not address this issue, the second element of the RPA claim is insufficiently pled.

As for the third element, price discrimination, Felder's argues that this is shown by establishing (1) below-cost pricing and (2) a reasonable prospect of recoupment (Doc. 25 at 10 (citing *Brooke Group*)). However, this is legally incorrect.  Below-cost pricing and recoupment are prerequisites to recovery for *predatory pricing*. *Brooke Group*, 509 U.S. at 223. Price discrimination requires a showing that the defendant charged different buyers different prices for the same item(s). *Water Craft*, 361 F. Supp. 2d at 526. The Complaint does not allege that GM discriminated in price as between All Star and Felder's (or, for that matter, between any two distributors), nor does it allege that that any of the Defendant-dealers charged different buyers different prices for the same item. Thus, Felder's does not allege facts from which a fact finder could plausibly find Defendants engaged in price discrimination.[10] Nevertheless, the Court grants Felder's' request to amend its complaint.

## B.  Sherman Act

Turning to the attempted monopolization claim under § 2 of the Sherman Act,[11] in order to withstand a motion to dismiss, the Complaint must sufficiently allege (1) that Defendants have

---

[10] Where price discrimination is not alleged, as required by the third element, the Court must also conclude that fourth element is deficiently pled because, by its terms, the RPA "condemns price discrimination only to the extent that it threatens to injure competition." *Brooke Group*, 509 U.S. at 220.

[11] The Court reiterates that the elements for attempted monopolization will be applied to the § 2 claim. *Supra*, p. 6.

engaged in in exclusionary conduct; (2) that Defendants engaged in such conduct with a specific intent to monopolize; and (3) that there is a dangerous probability that Defendants will obtain monopoly power in the relevant market. *Spectrum Sports*, 506 U.S. at 456. Exclusionary conduct is defined as conduct "other than competition on the merits…that reasonably appear[s] capable of making a significant contribution to creating or maintaining monopoly power." *Taylor Pub.*, 216 F.3d at 475 (citing 3 Phillip E. Areeda & Herbert Hovenkamp, ANTITRUST LAW ¶ 651, at 82 (1996)) (internal quotation omitted).

## 1. Market Structure and Market Power

As a predicate to an attempted monopolization claim, a plaintiff must show that the defendant has significant market power. Market power is a measure of a firm's "ability to control prices or exclude competition." *Roy B. Taylor Sales, Inc. v. Hollymatic Corp.*, 28 F.3d 1379, 1386 (5th Cir. 1994). Where a defendant's market power is insignificant, it is unlikely that a plaintiff will be able to "show a dangerous probability that [the defendant will] gain monopoly power in" the relevant market, as required for an attempted monopolization claim. *Surgical Care Ctr. of Hammond, L.C. v. Hosp. Serv. Dist. No. 1 of Tangipahoa Parish*, 309 F.3d 836, 840 (5th Cir. 2002). However, before market power can be assessed, a definition of the relevant market is required. *Jayco Sys., Inc. v. Savin Bus. Machines Corp.*, 777 F.2d 306, 319 (5th Cir. 1985).

### a. Market Definition

An adequate definition of the relevant market is critical because it "provides the framework against which economic power can be measured."[12] *Id*. The Fifth Circuit has recognized that a trial court may dismiss a § 2 claim for a plaintiff's failure to define the relevant market. *Id*.; *see also Apani Sw., Inc. v. Coca-Cola Enterprises, Inc.*, 300 F.3d 620, 628 (5th Cir.

---

[12] Here, for example, an analysis of market power would vary depending upon whether the product market is defined as a market for "auto parts" or, alternatively, a market for "collision parts compatible with GM automobiles for which there is an aftermarket alternative."

2002) (explaining that deficient market definition may be grounds to grant a motion to dismiss a § 1 claim).[13] A plaintiff's complaint must "plausibly define the relevant product and geographic markets." *PSKS, Inc. v. Leegin Creative Leather Products, Inc.*, 615 F.3d 412, 417 (5th Cir. 2010) (internal citation omitted). The proposed product market must account for cross-elasticity of demand, i.e., whether a product is "reasonably interchangeable by consumers for the same purposes." *Id.* The plaintiff must offer evidence "demonstrating not just where consumers currently purchase the product, but where consumers could turn for alternative products or sources of the product if a competitor raises prices." *Doctor's Hosp. of Jefferson*, 123 F.3d at 311. The proposed geographic market "must correspond to the commercial realities of the industry and be economically significant." *Apani*, 300 F.3d at 628, and it must account for "the area of effective competition...in which the seller operates, and to which the purchaser can practicably turn for supplies." *Id.* (citation omitted).

The Complaint vaguely and inconsistently refers to numerous markets without stating which is relevant. The various product markets referred to by Felder's include markets for: (1) car collision parts compatible with GM vehicles and for which there is no aftermarket equivalent; (2) replacement parts compatible with GM vehicles for which there is no aftermarket alternative; and (3) collision parts compatible with GM vehicles and for which there is an aftermarket alternative. Defendants note that the first two markets are not the same because "collision" parts and "replacement" parts are different, and the third market is completely different from the first two markets. This inconsistency without specifically identifying relevant product market(s),

---

[13] According to the Fifth Circuit,

> Whether a relevant market has been identified is usually a question of fact; however, in some circumstances, the issue may be determined as a matter of law. Where the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient, and a motion to dismiss may be granted.

*Apani*, 300 F.3d at 628 (internal quotations and citations omitted).

according to Defendants, is grounds for dismissal. Additionally, Defendants argue that the proposed geographic market is legally insufficient because the Complaint does not allege the number of competitors in the market, where market competitors operate or where they may reasonably turn for supplies, and does not state that Felder's is the only aftermarket dealer in the relevant market. Further, notwithstanding Felder's' allegation that four of its competitors were driven into bankruptcy by the pricing program, Defendants argue that the market definition is inadequate because Felder's fails to state whether the bankrupted entities competed with All Star, sold only GM-compatible parts, or operated in the relevant geographic area.

The Court recognizes the potential for confusion regarding the multiple product markets mentioned in the Complaint. However, the Fifth Circuit has recognized that multiple markets may be relevant. "[E]conomically significant submarkets may exist which themselves constitute relevant product markets." *Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*, 732 F.2d 480, 487 (5th Cir. 1984). Thus, the Court finds that the allegations are sufficient to withstand the motion to dismiss. It is at least plausible that there are at least two product markets working in tandem. The first market is the market for OEM automobile parts, which GM sells to All Star, where there is an aftermarket equivalent. The second market is the market for OEM automobile parts compatible with GM vehicles for which there is no aftermarket equivalent. However, Felder's' failure to specify the relevant market(s) in the Complaint is a deficiency which must be cured.

Turning to the proposed geographic market, southern Louisiana and southern Mississippi, Felder's does not address whether consumers could practicably turn to other geographic areas for parts, nor does Felder's specify whether competing dealers from outside areas could come into the market. Thus, Felder's has failed to allege specific facts regarding the "area of effective competition." *Apani*, 300 F.3d at 628, which must be cured. To establish a relevant geographic

market, Felder's must allege further detail regarding the number of competitors in the geographic area, the area of effective competition, whether buyers can practicably turn to other sellers for supplies, and whether other dealers can reasonably move into the market to compete.

In sum, the definition of the relevant market is critical because it is the leg upon which much of the attempted monopolization analysis stands. Felder's cannot vaguely propose a series of markets without identifying which are relevant in the Complaint and expect that this Court will analyze, for example: (1) whether Defendants have market power in each market, (2) whether barriers to entry exist in each market, and (3) whether there is a dangerous probability that Defendants will achieve monopoly power in each market. Accordingly, more specificity will be required in the amended complaint.

**b.  Defendants' Market Power**

Defendants argue that Felder's' Complaint should be dismissed for failure to allege sufficient facts regarding Defendants' market power. The Court agrees, as this conclusion must be reached since the Court has found that the Complaint insufficiently defines the relevant market(s). Quite simply, "[a]n assessment of market power requires a definition of the relevant market." *Roy B. Taylor*, 28 F.3d at 1386.

Substantial market power "may result solely from control of a large share of the market, or from control of some significant part of a market containing characteristics that allow it to be controlled by a participant not having a grossly disproportionate share of it." *Domed Stadium*, 732 F.2d at 489. But a firm's market share is only one measure of the firm's market power, *id.*, as measurement of market power also requires consideration of other factors including: "the strength of the competition, probable development of the industry, the barriers to entry, the nature of the anti-competitive conduct, and the elasticity of consumer demand." *Pastore v. Bell*

*Tel. Co. of Pennsylvania*, 24 F.3d 508, 513 (3d Cir. 1994). Even when a firm has a statistically high market share, these additional factors may undercut the firm's true market power. For instance, absent barriers to entry, "a competitor waiting on the sidelines can deny those in the market the power to control prices-because current players cannot exclude competition." *Roy B. Taylor*, 28 F.3d at 1388. Still, in order to establish attempted monopolization under § 2 of the Sherman Act, a plaintiff must show that "a defendant must have [a] legally significant share of the market." *Pastore*, 24 F.3d at 490.

Felder's asserts that GM must necessarily dominate the market because "the relevant product market in this case is for collision replacement parts compatible with GM automobiles." (Doc. 25 at 21). Such a naked assertion of market domination is not legally sufficient under the Fifth Circuit's standards to establish market power.[14] Rather, Felder's statement regarding GM's dominant position only speaks to the firm's market share. Additionally, Felder's assertion about GM's market share does not directly address whether the Defendant-dealers—All Star and Doe Defendants—dominate the market to the potential exclusion of Felder's and other aftermarket parts distributors. Felder's argues that, since four of its competitors have closed since the pricing program commenced, it could plausibly be inferred that Defendants have some degree of market power. The Court recognizes Felder's position, and this inference could be drawn if it is also assumed that the bankrupted competitors operated in the relevant market. However, as previously stated, Felder's must amend to provide further factual support as to whether the bankrupted competitors operated in the relevant market.

---

[14] As the Fifth Circuit has explained:
> We do not suggest here a market share percentage that of itself rises to the level of legal significance, but note that a share of less than the fifty percent generally required for actual monopolization may support a claim for attempted monopolization if other factors such as concentration of market, high barriers to entry, consumer demand, strength of the competition, or consolidation trend in the market are present.

*Domed Stadium*, 732 F.2d at 490.

Regarding one of the other factors for market power, barriers to entry,[15] the Complaint states that "barriers to entry into the automotive parts industry are high and difficult…." (Doc. 1 at 10). Defendants retort that this is a legally insufficient conclusory statement. Felder's counters that the Complaint establishes the overall scheme in which All Star can undersell Felder's and then collect a rebate for lost profits. Felder's argues that, at this stage of litigation, it is sufficient to allege an "anticompetitive scheme that itself creates the barriers to entry." (Doc. 20 at 20). *See Nat'l Athletic Trainers' Ass'n, Inc. v. American Physical Therapy Ass'n*, 2008 WL 4146022, at *14 (N.D. Tex. 2008). Defendants reply that "it is impossible to tell whether any barriers exist with respect to parts manufacturing or parts distribution, or both." (Doc. 22-1 at 14). The Court is inclined to agree with Defendants, but the underlying flaw in Felder's' position is a failure to identify exactly which market(s) it references when it says barriers to entry exist in "the market."[16] Thus, the Court reiterates that Felder's must clarify which markets are relevant in an amended complaint. However, the Court agrees with Felder's that it is plausible that new market entrants dealing aftermarket parts would find it difficult to compete with OEM dealers, like All Star, while the challenged pricing program exists. Furthermore, "[t]he question is not whether there are barriers to entry, but rather whether the barriers in a particular industry are large enough to trigger judicial concern." *FMC Corp.*, 170 F.3d at 531. Thus, although Felder's' allegations are thin, the Court finds that Defendants' sudden and drastic reduction in prices warrants judicial concern and that Felder's' allegations are sufficient to withstand a motion to dismiss.

---

[15] The market power analysis, here, assesses market power in light of *existing* barriers to entry. Notably, barriers to entry are also discussed, *infra*, but the inquiry below assesses the potential existence of *future* barriers to entry which might contribute to a dangerous probability that Defendants will recoup.

[16] If "the market" is the "automotive parts industry," then Defendants' market share is statistically different than it would be if the relevant market were defined as "collision parts compatible with GM vehicles." This is an illustration of why the Fifth Circuit requires definition market of relevant market(s). *See supra* note 13.

Felder's must amend its Complaint to include more specific allegations regarding the definition of the relevant market(s), the number of competitors in the market, and the current state of competition. Additionally, even though courts do not require a specific market share percentage to warrant recovery for a § 2 claim, Felder's must provide specific allegations supporting that Defendants' market share is significant. Finally, Felder's must provide further specifics as to why Defendants have legally significant market power given (1) the nature of the relevant market(s) and (2) Defendants' market share therein.

### 2. Attempted Monopolization Elements

As referenced above, the first element of an attempted monopolization claim is exclusionary conduct. Here, the alleged exclusionary conduct is predatory pricing. The essence of a predatory pricing claim is as follows: "A business rival has priced its products in an unfair manner with an object to eliminate or retard competition and thereby gain and exercise control over prices in the relevant market." *Brooke Group*, 509 U.S. at 221. A predatory pricing claim under § 2 of the Sherman Act must sufficiently allege facts supporting the two prerequisites to recovery—namely, that (1) the defendant's pricing is below an appropriate measure of its costs, and (2) there is a dangerous probability that the defendant will recoup any losses sustained during the below-cost pricing period. *Brooke Group*, 509 U.S. at 222-24.[17]

Although *Brooke Group*'s predatory pricing prerequisites strike at the first and third elements of an attempted monopolization claim, the prerequisites do not directly relate to the second element of attempted monopolization—namely, the issue of specific intent. Regarding the first element (sometimes, the "conduct element") of attempted monopolization, predatory pricing is generally one form of exclusionary behavior. Furthermore, since "[t]he success of any

---

[17] While § 2 of the Sherman Act condemns "predatory pricing when it poses a dangerous probability of actual monopolization," the RPA "requires only that there be a reasonable possibility of substantial injury to competition before its protections are triggered." *Brooke Group*, 509 U.S. at 222 (internal quotations and citations omitted).

predatory scheme depends on *maintaining* monopoly power for long enough both to recoup the predator's losses and to harvest some additional gain," *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 589 (1986) (emphasis in original), the recoupment prong of a predatory pricing claim overlaps with the third element of attempted monopolization. Put differently, in order to establish that a defendant has a dangerous probability of recoupment, the plaintiff must also offer proof that the defendant has a dangerous probability of acquiring monopoly power or already possesses such power.

Therefore, Felder's must provide facts sufficient to support inferences that: (1) Defendants' prices are below an appropriate measure of their costs, (2) there is a dangerous probability that Defendants' will recoup profits lost due to below-cost sales, and (3) Defendants' engaged in the alleged predatory practice with the specific intent to gain monopoly power.

### a. <u>Predatory Pricing</u>

When analyzing a claim of predatory pricing, courts routinely address the recoupment element first, because "[i]f there is no likelihood of recoupment, it would seem improbable that a scheme would be launched." *FMC Corp.*, 170 F.3d at 528.[18] "Only if market structure makes recoupment feasible need a court inquire into the relation between price and cost." *A.A. Poultry Farms*, 881 F.2d at 1401. Recoupment has two prongs. First, a plaintiff must show that the predatory scheme "could actually drive the competitor out of the market." *FMC Corp.*, 170 F.3d at 528. Second, "there must be evidence that the surviving monopolist could then raise prices to consumers long enough to recoup his costs without drawing new entrants to the market." *Id.* at 528-29 (citing *Brooke Group*). The question is whether a defendant will be able to offset losses by recovering "in the form of later monopoly profits." *Brooke Group*, 509 U.S. at 224.

---

[18] Accordingly, the recoupment analysis assumes *arguendo* that below-cost pricing can be established. *See FMC Corp.*, 170 F.3d at 532 (explaining this procedure for analysis of predatory pricing).

Defendants contend that Felder's has failed to plead sufficient facts to permit such an inference because: (1) Felder's has failed to sufficiently allege facts regarding the relevant market and the state of competition therein; (2) in several places, Felder's merely recites the legal element for recoupment; (3) Felder's has failed to specifically allege barriers to entry exist that make recoupment feasible; and (4) Felder's admits that the program has existed for years, yet pricing remains competitive. In opposition, Felder's argues that it has pled facts sufficient to meet the first prong of recoupment because Felder's has suffered a steady decline in profitability and market share since Defendants implemented the pricing program.

### i.   <u>First Prong of Recoupment – Possibility of eliminating Felder's</u>

Under the first prong, Felder's must adequately support the proposition that Defendants' alleged predatory conduct could drive Felder's out of the market. The Court recognizes Defendants' position—namely, that market power and market definition are essential to the analysis of whether Felder's could be (or is being) driven out of the market due to Defendants' conduct. However, having addressed these issues above, the Court's analysis must proceed under the assumption that a relevant market exists and that Defendants have sufficient market power to warrant antitrust concern under § 2 of the Sherman Act.

Before delving into the issue of whether Felder's could be driven out of business by the alleged predatory scheme, the Court first rejects the implication that the name of the program evidences such a likelihood. Felder's asserts that the title of the program, "Bump the Competition," is "very telling nomenclature." (Doc. 25 at 11). However, the name of the program has no bearing on whether predatory pricing exists.[19] The Court will not entertain arguments about the title of GM's program. Furthermore, "[i]t is axiomatic that the antitrust laws

---

[19] *See R.J. Reynolds Tobacco Co. v. Cigarettes Cheaper!*, 462 F.3d 690, 696 (7th Cir. 2006) (observing that phrases like "kill the competition" do not support inference of predatory pricing).

were passed for the protection of *competition*, not *competitors*." *Brooke Group*, 509 U.S. at 224 (emphasis in original) (internal quotation and citation omitted). Since competition is the "conduct the antitrust laws are designed to protect." *Matsushita*, 475 U.S. at 594, Felder's is simply incorrect to imply that "competition" is a dirty word.

When determining whether an alleged predatory scheme could eliminate a competitor, relevant considerations include "the extent and duration of the alleged predation, the relative strength of the predator and its intended victim, and their respective incentives and will." *Brooke Group*, 509 U.S. at 225 (internal quotation and citation omitted). Pushing aside the issue of the parties' relative strength, the Court addresses the extent and duration of alleged predation.

Defendants reference the duration of the pricing program in the course of arguing that All Star is unlikely to ever recover profits.[20] Defendants do not, however, argue that the duration of the program evidences that Felder's will continue to coexist while the program continues. In opposition, Felder's further explains its theory of why it could be driven out of the market if the pricing program is not condemned, relating its theory to the extent and duration of the program in the course of the argument (Doc. 25 at 14-16). Felder's argues there are two ways in which All Star profits[21] from sales of OEM parts. First, when All Star sells OEM parts that have an aftermarket equivalent, GM's program provides All Star with the option to sell at a price below dealer cost and collect a rebate. Second, even though the program does not apply to OEM parts without an aftermarket equivalent, All Star nevertheless profits on the sale of these OEM parts

---

[20] All Star's ability to recover profits does not have to do with whether Felder's will be driven out of business, but rather has to do with the second prong of the recoupment analysis.

[21] Felder's actually uses the word "recoup." As Defendants correctly point out, this is technically inaccurate, since recoupment has to do with recovering lost profits after an alleged predator has driven its competition out of business. The term "recoup," therefore, properly refers to the ability to recover profits lost as a result of below-cost pricing by charging supracompetitive prices after other firms have been driven out of business by a predator. Notwithstanding Felder's' technical misuse of the term recoup, its point is well taken—that Defendants make money (1) by selling OEM parts that have no aftermarket equivalent at high prices, and (2) by selling OEM parts with aftermarket equivalents at prices that undercut competition.

by keeping prices high since GM already has a monopoly on these parts. Felder's asserts that Defendants will be able to eliminate Felder's and other similarly situated aftermarket dealers, at which point the OEM dealers will be able to increase the price on parts for which there were once aftermarket parts. Furthermore, Felder's alleges that, since the implementation of the program, its revenues have significantly decreased and four other distributors have been driven to bankruptcy. At this stage of the litigation, although Felder's has not adequately addressed market power and definition, the Court finds that the allegations regarding extent and nature of the program support a plausible inference that Felder's could be driven out of business by the program's continued existence.[22] Therefore, Felder's' allegations regarding the first prong of recoupment are sufficient to withstand a motion to dismiss.

### ii.  Second Prong of Recoupment – Plausibility of Recoupment

The second prong assesses the probability of whether Defendants could charge supracompetitive prices for a period of time long enough to recoup profit lost as a result of the challenged program. The object of this inquiry is to determine the likelihood of a predator's success in achieving the end goal of any predatory plan—net profit. Courts will not condemn behavior where it appears likely that a predator's plan will fail to be profitable, because such behavior "produces lower aggregate prices in the market, and consumer welfare is enhanced." *Brooke Group*, 509 U.S. at 224.

Defendants question Felder's' allegation that All Star will be able to set supracompetitive prices to recoup the losses associated with the pricing program once aftermarket competitors have been driven out of business. Defendants contend that All Star has nothing to recoup because

---

[22] Since the Court has already stated that Felder's must amend to clarify whether the bankrupted entities competed in the relevant market, *supra* at p. 12-13, the conclusion reached here assumes that the bankrupted entities did in fact compete in the relevant market.

prices are not below cost, as required to establish liability for a predatory pricing scheme.[23] Alternatively, Defendants assert that Felder's allegations are not sufficient to show that recoupment is plausible, because Felder's has provided insufficient factual support regarding market definition and the potential for future barriers to entry. Finally, Defendants contend that because All Star has not raised prices in the last four years, this undercuts the notion that the firm has the ability to recover profits in the future.

The Court first addresses Defendants' argument regarding market definition. Critically, Felder's' allegations regarding how All Star profits on OEM parts *today* has little to do with the relevant inquiry under the second prong of recoupment, which is whether All Star will be able to recover profits lost as a result of the "Bump the Competition" sales by charging supracompetitive pricing if Felder's goes out of business *in the future*. Since such a prediction certainly relates back to the issue of market definition, Felder's must allege additional facts to show how this particular market structure is susceptible to a monopoly takeover by All Star for a long enough period so that All Star would be able to net a profit in the future by charging supracompetitive prices to offset losses sustained by the current pricing structure.

Related to the issue of market definition is the issue of whether future barriers to entry would enable recoupment. One key market factor to consider whether the alleged predator will be able to "raise prices to consumers long enough to recoup his costs without drawing new entrants to the market." *FMC Corp.*, 170 F.3d at 528-29 (citing *Brooke Group*). "If barriers to entry in an industry are low, new entrants into the industry will appear when the monopolist raises its prices, and the net effect of the campaign will be a loss to the predator. . . ." *Id.* at 530.

For a predatory pricing claim, a court "should focus on whether significant entry barriers would exist *after* the [defendant] had eliminated some of its rivals." *Cargill, Inc. v. Monfort of*

---

[23] Below cost pricing is addressed *infra*.

*Colorado, Inc.*, 479 U.S. 104, 119 n.15 (1986). It is only "at that point the remaining firms would begin to charge supracompetitive prices, and the barriers that existed during competitive conditions might well prove insignificant." *Id.*

As referenced above, the Complaint states "barriers to entry into the automotive parts industry are high and difficult…." (Doc. 1 at 10). Defendants argue that this is a "naked assertion" that is insufficient to withstand a motion to dismiss. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Further, Defendants argue that existing barriers to entry are not the question. In this regard, the Court agrees that, in the context of recoupment, the question is "whether significant entry barriers would exist *after* the [defendant] had eliminated some of its rivals." *Cargill*, 479 U.S. at 119 n.15. It is only "at that point the remaining firms would begin to charge supracompetitive prices, and the barriers that existed during competitive conditions might well prove insignificant." *Id.*

Defendants additionally rely on *FMC Corp.* for the point that Felder's' allegations regarding barriers to entry are insufficient. In *FMC Corp.*, the plaintiff argued that the defendant would be able to raise prices after driving the plaintiff out of business, because of alleged barriers to entry in the marketplace including "transportation costs, manufacturing costs, and the demonstrated ability of the dominant firm to charge supracompetitive prices." *FMC Corp.*, 170 F.3d at 530 (internal quotations omitted). The Fifth Circuit rejected the plaintiff's argument, noting that "[t]he question is what will stop foreign firms from appearing on the scene, pointing out to municipalities the supracompetitive prices, and providing an alternative." *Id.* While the Court recognizes Defendants' position, the Fifth Circuit was reviewing a motion for summary judgment, not a motion to dismiss. Although Felder's' allegations are thin, at this point in the litigation, they are sufficient to withstand the motion to dismiss. However, Felder's' will have to

adduce evidence that future entry into the market is difficult beyond Defendants' ability to charge supracompetitive prices. Felder's will have to show that the future barriers to entry in the relevant market(s) are significant enough to trigger the Court's concern.[24]

Turning back to the extent and nature of the pricing program, Defendants contend that while the program has existed for several years, pricing is still competitive, and therefore, it is unlikely that All Star could ever recoup its investment. Defendants point out that one of the reasons that courts are skeptical of predatory schemes because it is nearly impossible to successfully achieve the end goal of recouping lost profits. *FMC Corp.*, 170 F.3d at 527-28 ("[T]he consensus among economists [is] that such schemes are difficult if not impossible to successfully complete and thus unlikely to be attempted by rational businessmen."). In response, Felder's argues that this is a factual issue inappropriate for consideration at this stage. Significantly, neither party cites any authority that imposes a time period for how long a program must exist to support plausibility of recoupment. The Supreme Court has noted the extended length of a program may undercut the plausibility of recoupment. *Matsushita*, 475 U.S. at 591 ("Two decades after their conspiracy is alleged to have commenced, petitioners appear to be far from achieving this goal: the two largest shares of the retail market in television sets are held by RCA and respondent Zenith, not by any of petitioners."). Although the alleged pricing scheme here has not been in existence for nearly as long as the program in *Matsushita*, the Court finds that this fact is not dispositive of whether there is a dangerous probability of recoupment in the future.

In sum, the central flaw with respect to the entire recoupment analysis relates back to Felder's' need to amend the Complaint with respect to market definition and market power. The

---

[24] To reiterate, here the analysis is unlike the analysis of barriers to entry above, which asks about existing barriers to entry. *See supra* note 15 and accompanying text. The inquiry with respect to recoupment is whether future barriers to entry will exist that could influence a defendant's ability to charge supracompetitive prices.

Court agrees with Defendants to this extent. *Cf. Brooke Group*, 509 U.S. at 226 ("In certain situations—for example, where the market is highly diffuse and competitive, or where new entry is easy, or the defendant lacks adequate excess capacity to absorb the market shares of his rivals and cannot quickly create or purchase new capacity—summary disposition of the case is appropriate."). Nevertheless, the Court also recognizes that, due to the nature of predatory pricing claims, the "prerequisites to recovery are not easy to establish." *Id*. For that reason and those stated above, the Court concludes that Felder's' allegations with regard to recoupment are sufficient to trigger antitrust concern at this stage of the litigation.

### iii. Below Cost Pricing

The Court now addresses the issue of below-cost pricing. Felder's' Complaint states that All Star and Doe Defendants sold OEM parts below cost.[25] The parties dispute the appropriate measure of cost for the purposes of this analysis. The fundamental disagreement between the parties is temporal in nature and, as such, the question before the Court is whether below-cost pricing should be adjudged at the time of sale, as Felder's contends, or after the dealers are reimbursed by GM, as Defendants assert.

Felder's alleges that—at the time of the sale—the Defendant-dealers sell the OEM parts at a price below the dealers' cost. Felder's argues that this allegation is sufficient to establish below-cost pricing under the Fifth Circuit's standards. Defendants recognize that the point-of-sale price is below dealer cost. However, Defendants contend that the sales were not below-cost because dealers are made whole under the pricing program and, in fact, make a profit. As the exhibits illustrate, GM compensates participating dealers who sell at the bottom line price by refunding claims for the difference between the sale price and the dealer's cost, plus a 14%

---

[25] Felder's does not allege that GM sold parts below cost in the course of transacting with the Defendant-dealers.

profit. Thus, Defendants contend that it is appropriate to view the entire transaction when determining whether the sales are below-cost.

Defendants further contend that Felder's' arguments fail to account for how the parts are sold to collision centers and body shops. Defendants point to a footnote in *FMC Corp.*, which provides that the entire transaction, rather than its individual components, must be below cost for a predatory pricing claim. *See FMC Corp.*, 170 F.3d at 533 n.15. Felder's, however, argues that Defendants' focus *FMC Corp.* is inapposite. After reviewing *FMC Corp.*, the Court agrees with Defendants' interpretation of the case.

In *FMC Corp.*, the plaintiff argued that a part of the defendant's project would "run at a negative operating margin." *Id.* at 533. This, according to the plaintiff, was evidence of a below cost price. However, as the Fifth Circuit noted, the plaintiff's allegation was flawed because even if a particular part of the project were below cost, the plaintiff failed to allege that the "project *as a whole* was unprofitable." *Id.* at 533 n.15 (emphasis added). Having previously confronted a similar argument, the court further explained that it has rejected a plaintiff's contention that price cuts should be examined in isolation. *Id.* The Fifth Circuit concluded that this would be akin to looking at a "buy one get one free" deal and only looking at the price of the free product to conclude that there was predation. *Id.*

Based on *FMC Corp.*, this Court concludes that considering the transaction 'as a whole' is appropriate. Felder's' contention that the analytical focus of below-cost pricing should be limited to the time of sale is difficult to square with the logic espoused in *FMC Corp.* The more reasonable inference drawn from *FMC. Corp.* is that the cost and revenue associated with a particular sale should not be dissected into pieces, but rather treated as a whole, regardless of the time associated with any discount or rebate programs. Additionally, the Court is persuaded by

the authority cited by Defendants, suggesting that, in the context of an RPA claim, price is measured after considering any discounts or rebates. *See A.A. Poultry Farms*, 881 F.2d at 1407 ("Selling a chain 100% of its requirements at 80¢/dozen is the same as furnishing 80% of the requirements at $1.00/dozen and giving it the other 20% for 'free.' Whether price discrimination has occurred depends, therefore, on the price *after* all discounts, specials, and so on."). To find that the relevant sales by All Star are below-cost ignores the commercial realities of the transaction – specifically the fact that All Star probably would not sell at the suggested "bottom-line" price absent GM's claim system, which allows for collection of the difference between the sales price and dealer cost, plus a 14 percent profit.

Having disposed of the parties' temporal debate, the question remains whether the sales are below-cost under the Fifth Circuit's standards. Predatory pricing claims require a showing that pricing is below some "appropriate measure" of cost. *Brooke Group*, 509 U.S. at 223.[26] Although circuits are split on what constitutes the appropriate measure of cost, *see id.* at n.1 (explaining this split), the Fifth Circuit has "long embraced" the standard that average variable cost ("AVC") is an appropriate measure of cost. *FMC Corp.*, 170 F.3d at 528 (5th Cir. 1999) (reaffirming this standard after *Brooke Group*). Accordingly, this Court must consider prices below AVC as "below-cost" for the purposes of a predatory pricing claim. *Id.*

All costs can be lumped into one of two categories—fixed or variable. *FMC Corp.*, 170 F.3d at 532. Fixed costs are those that remain substantially unaffected due to changes in short-term output—for example, the costs associated with acquiring land. *Id.* Variable costs are those which are affected by changes in output – for example, hourly wages, cost of materials, or other costs associated with production. *Id.* AVC is measured by dividing variable costs by output.

---

[26] Where the challenged prices are above cost, recovery is rare because such claims could set a precedent that may have a chilling affect on the type of legitimate price cuts that directly benefit consumers. *Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co., Inc.*, 549 U.S. 312, 319 (2007).

*Taylor Pub.*, 216 F.3d at 478 n.6.[27] AVC is not, as Felder's suggests, "cost of the part plus the variable costs of selling the part." (Doc. 1 at 5). Notably, the Fifth Circuit "has found that judgment as a matter of law is appropriate when a plaintiff fails to adequately specify how the challenged pricing undercuts the defendant's variable costs." *Id.*

Felder's' Complaint focuses on (1) the cost that the Defendant-dealers paid to GM and (2) the Defendant-dealers' sale price. More is required under the Fifth Circuit's standard. *See FMC Corp.*, 170 F.3d at 532 (observing that failure to "explor[e] the relationship between variable costs, fixed costs, and profits" is legal error). Perhaps the lack of exploration is due, in whole or in part, to the circumstances—namely, that Felder's may not have access to certain information about Defendants' costs and profits. Alternatively, the failure could be attributable to the fact that Felder's used the incorrect formula to calculate AVC. Regardless, Felder's must address these deficiencies by amendment.

### b. <u>Specific Intent to Achieve Monopoly Power</u>

Specific intent to monopolize is an essential element of an attempted monopolization claim. *Adjusters Replace-A-Car, Inc. v. Agency Rent-A-Car, Inc.*, 735 F.2d 884, 887 (5th Cir. 1984). "The intent must be to do more than compete vigorously; vigorous competition is precisely what the antitrust laws are designed to foster." *Id.* Rather, the plaintiff asserting attempted monopolization must show a defendant's specific intent to acquire and exercise the power to fix price or exclude competition. *Id.* (citations omitted). Felder's alleges that Defendants entered into the pricing program with GM for the "specific purpose of eliminating competition and making GM the only seller of collision parts for repairs of GM vehicles in southern Louisiana and Southern Mississippi." (Doc. 1 at 5). Defendants' Motion to Dismiss

---

[27] For further explanation of costs, *see FMC Corp.*, 170 F.3d at 532.

does not directly argue this issue. Thus, the Court declines to delve into whether Felder's allegations provide sufficient factual support regarding the specific intent element.

### c.  **Dangerous Probability of Obtaining Monopoly Power**

Under the third element for an attempted monopolization claim, Felder's must show that Defendants have a dangerous probability of obtaining monopoly power due to the program. As previously stated, the recoupment analysis for predatory pricing directly relates to this final element for attempted monopolization. Thus, the Court finds that the analysis of the former, *supra*, applies equally here. Accordingly, in an amended complaint permitted, Felder's must provide further factual support regarding the issues discussed in the recoupment analysis, including Defendants' market power and Defendants' potential ability to dominate the market to the exclusion of others for a time period long enough to recover money lost as due to the alleged predatory program.

### C.  **Standing under Federal Antitrust Law**

In Defendants' Motion to Dismiss, the issue of antitrust standing is raised in a footnote (Doc. 16 at n.12). Private party standing in antitrust litigation is governed under the Clayton Act.[28] Antitrust standing only exists where "a plaintiff shows: 1) injury-in-fact, an injury to the plaintiff proximately caused by the defendants' conduct; 2) antitrust injury; and 3) proper plaintiff status, which assures that other parties are not better situated to bring suit." *Doctor's Hosp.*, 123 F.3d at 305. The third prong is not argued by Defendants. The core contention of Defendants' argument is that the Complaint does not support an inference that the complained-of injury flows from the alleged predatory conduct. Felder's does not counter this argument in opposition. The Complaint simply asserts that the alleged violations of federal antitrust law give

---

[28] 15 U.S.C. § 15(a) ("[A]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor"); 15 U.S.C. § 26 (providing that private parties "threatened [with] loss or damage by a violation of the antitrust laws" may seek injunctive relief).

rise to a private right of action for damages under §4 of the Clayton Act, 15 U.S.C. § 15(a), and for injunctive relief under § 16 of the Clayton Act. 15 U.S.C. § 26. Nevertheless, because neither party has sufficiently briefed the law with respect to the issue of antitrust standing, the Court declines to resolve the issue at this time.

## LOUISIANA'S ANTITRUST LAWS

The Court next addresses the state law claims, starting with the claimed violations of Louisiana's antitrust statutes. Felder's alleges that Defendants have violated La. R.S. 51:122 and La. R.S. 51:123, which are the functional equivalents to § 1 and § 2 of the Sherman Act, respectively. Because the state statutes track the Sherman Act almost verbatim, "Louisiana courts have turned to the federal jurisprudence analyzing those parallel federal provisions for guidance." *Southern Tool & Supply, Inc. v. Beerman Precision, Inc.*, 03-0960, p. 7 (La. App. 4 Cir. 11/26/03); 862 So.2d 271, 278. Thus, the analysis of the alleged § 2 violation, *supra*, is relevant, and Felder's must amend with respect to La. R.S. 51:123 for the same reasons articulated in the foregoing discussion of § 2.

As for La. R.S. 51:122, the Complaint is also deficient because it states that Defendants are liable for "conspiracy in restraint of trade," which is simply a recitation of La. R.S. 51:122 and its federal counterpart, § 1. (Doc. 1 at 16).  Both require proof of an agreement that unreasonably restrains trade. *Southern Tool*, 862 So.2d at 278. However, Felder's never alleged a § 1 violation. As such, Felder's' naked assertion that Defendants violated the equivalent state statute is insufficient as stated.

As for the other revised statutes cited to in Count Four of the Complaint, §§ 51:124(A), 51:137, and 51:422, the Court reaches a similar conclusion. Felder's' position is that the federal antitrust allegations are sufficient support these claims. However, having found that the federal

28

antitrust allegations are insufficient as pled, the Court must also find that the alleged violations of state law are insufficient.

In sum, it is true that violations of federal antitrust law can support a claim that Louisiana's antitrust law has been violated, *provided that the federal antitrust violations are sufficiently pled*. Because Felder's' allegations are currently insufficient to support the federal antitrust claims, it follows that the state law claims are deficient, as Felder's merely restates each revised statute in its Complaint. Felder's may amend to cure such deficiency. Regarding La. R.S. 51:123, the Court will hold Felder's to standards similar to those stated in the § 2 analysis. However, since neither parties has sufficiently briefed the issues presented under § 1 and La. R.S. 51:122, the Court declines delve into further detail regarding what will be required in the amendment. The Court reaches the same conclusion with respect to §§ 51:124(A), 51:137, and 51:422. Felder's may attempt to cure these deficiencies in an amended complaint.

## **LUTPA**

Defendants contend that Felder's fails to allege facts sufficient to establish a violation of the Louisiana Unfair Trade Practices Act ("LUTPA"). Defendants argue the LUTPA claim fails because Felder's fails to allege conduct that falls within the range of fraudulent or deceptive practices prohibited by LUTPA, and also because Felder's has not, in Defendants' view, sufficiently alleged the antitrust violation upon which the LUTPA claim is premised.

Private parties have a right of action under LUTPA. *Cheramie Services, Inc. v. Shell Deepwater Production, Inc.* 2009-1633 (La. 4/23/10); 35 So.3d 1053, 1060, *construing* La. R.S. 51:1409(A). The Supreme Court of Louisiana recently held that this right of action extends to all persons, including business competitors, who assert loss of money or property as a result of another's unfair or deceptive trade practices. *Id*. LUTPA prohibits "[u]nfair methods of

competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." La. R.S. 51:1405(A). Businesses are prohibited from engaging in "fraud, misrepresentation, deception, and other oppressive and unscrupulous conduct." *Tubos de Acero de Mexico, S.A. v. Am. Intern. Invest. Corp.*, 292 F.3d 471, 480 (5th Cir. 2002). "[O]nly egregious actions involving elements of fraud, misrepresentation, deception, or other unethical conduct will be sanctioned based on LUTPA." *Cheramie*, 35 So.3d at 1060. The "range of prohibited practices under LUTPA is extremely narrow," *id.*, and "sound business practice or the exercise of permissible business judgment" are not prohibited. *High Tech Communications v. Panasonic Co.*, 1995 WL 65133, at *3 (E.D. La. 1995).

A party "alleging fraud or mistake…must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). Rule 9(b) further requires a plaintiff complaining of fraud to allege "the particulars of time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *Tel-Phonic Services, Inc. v. TBS Int'l, Inc.*, 975 F.2d 1134, 1139 (5th Cir. 1992) (internal quotations and citations omitted). In Louisiana, fraud requires a showing of "(1) a misrepresentation of a material fact, (2) made with the intent to deceive, and (3) causing justifiable reliance with resultant injury." *Newport Ltd. v. Sears, Roebuck & Co.*, 6 F.3d 1058, 1068 (5th Cir. 1993).

The parties dispute the issue of whether a LUTPA claim may be based solely upon a violation of federal antitrust laws. The parties' dispute boils down to differing interpretations of a recent decision by the Louisiana Court of Appeal for the First Circuit, *Van Hoose v. Gravois*, 2011-0976 (La. App. 1 Cir. 7/7/11); 70 So.3d 1017, 1024. In *Van Hoose*, the court concluded that the allegations were insufficient to establish "injury to competition," and that the plaintiff

therefore failed to "state a claim for unfair trade practices under the LUTPA." *Id.* at 1024. Felder's maintains that, under *Van Hoose*, a sufficiently pled a federal antitrust violation also suffices to state a cause of action under LUTPA. In reply, Defendants contend that Felder's has misread *Van Hoose* and, according to Defendants, the case is properly understood as standing for the proposition that a plaintiff's failure to sufficiently allege an antitrust violation supports a finding that the plaintiff has also failed to state a claim under LUTPA. The converse of this proposition, Defendants argue, is not necessarily true. The Court agrees. For this reason, as well as those in the paragraph that follows, Felder's has failed to specifically allege sufficient facts to support a claim under LUTPA.

Here, as a business competitor of All Star, Felder's would fit within the class of plaintiffs who have standing to bring a claim under LUTPA. However, a claim based on Felder's' lost profits is only actionable if the lost profits were a result of "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." *Cheramie*, 35 So.3d at 1057. Felder's does not specifically allege that Defendants committed fraud, misrepresentation, deception, or unethical conduct. Instead, the Complaint asserts that Defendants engaged in an effort to sell repair parts below cost, thereby committing an unfair or deceptive practice as contemplated by LUTPA. (Doc. 1 at 15, ¶ 51). This allegation is nothing more than a naked assertion followed by a recitation of the applicable law. Thus, the Court finds that the Complaint is insufficient to state a claim under LUTPA, but will grant Felder's' request for leave to amend to cure the deficiency.

## SOLIDARY LIABILITY UNDER La. Civ. Code art. 2324

La. Civ. Code art. 2324 provides the basis for solidary liability under Louisiana law. The article provides in pertinent part: "He who conspires with another person to commit an

intentional and willful act is answerable, in solido, with that person for the damage caused by that act." *Id*. Courts have clarified that Art. 2324 "does not recognize an independent cause of action for civil conspiracy." *Rhyce v. Martin*, 173 F. Supp. 2d 521, 535 (E.D. La. 2001). Rather, the actionable element is the wrong perpetrated by the actors involved in the conspiracy. *Id*. Stated differently, the conspiracy is the mechanism that must exist for a plaintiff to recover under Art. 2324. The mere existence of a conspiracy, however, is not a basis for liability.

Here, Felder's repeatedly asserts that Defendants engaged in a conspiracy throughout the Complaint. Yet, as Defendants correctly point out, nowhere in the Complaint does Felder's specifically allege an antitrust conspiracy claim. (Doc. 22-1 at 18). Defendants further argue that because the antitrust and other state law claims should be dismissed, the dismissal of those claims mandates dismissal of Felder's' claim for solidary liability.

As it stands, Felder's merely alleges that Defendants have conspired to commit violations of the law. (Doc. 1 at 17). Significantly, the Complaint (1) never mentions § 1 of the Sherman Act, which condemns unlawful conspiracies in restraint of trade, is never mentioned in the Complaint; (2) fails to specifically allege facts in support of the elements for a conspiracy to monopolize claim under § 2; and (3) fails to specifically plead a cognizable conspiracy claim under Louisiana antitrust law. Therefore, Felder's' argument skips the critical step of specifically pleading the existence of a conspiracy. In the absence of specific allegations supporting the existence of a conspiracy, Count 5 is deficient as pled.

### ALL STAR AS SINGLE DEFENDANT

Defendants assert that Felder's' reference to the three All Star entities as the "All Star Defendants" is impermissible. According to Defendants, Felder's has failed to allege specific facts related to each individual entity for its claims against the All Star entities to be actionable,

and such failure mandates dismissal. Felder's argues that the issue of whether the parent company should be dismissed is a matter for further discovery.

Defendants cite to two district court cases in support of their proposition. *In re California Title Ins. Antitrust Litig.*, C 08-01341 JSW, 2009 WL 1458025, at *7 (N.D. Cal. May 21, 2009); *McCray v. Fid. Nat. Title Ins. Co.*, 636 F. Supp. 2d 322, 335 (D. Del. 2009). In *McCray* and *California Title*, the issue was whether a plaintiff could recover from a parent company based on an agency or alter ego theory when the parent's subsidiary engaged in a "conspiracy" under § 1 of the Sherman Act. In both cases, the courts held that the plaintiffs' complaints insufficiently pled that the parent was involved in the conspiracy. *McCray*, 636 F. Supp. 2d at 335 ("Without some averment that the corporate parent defendants directly entered into agreements, or the [subsidiary defendants] are the corporate parent defendants' alter egos, the plaintiffs have not alleged enough to establish that the corporate parent defendants entered into a conspiracy"); *California Title*, 2009 WL 1458025, at *8 (rejecting argument based on agency theory since plaintiffs did "not attempt to allege any facts to show that the parent corporations knew what their subsidiaries were doing").

Here, Felder's has affirmatively alleged that the multiple All Star entities do business under a single trade name—All Star Automotive Group—and that the name is owned by All Star Advertising Agency, Inc. ("All Star Advertising"). Although the Complaint asserts that "All Star Defendants" engaged in a conspiracy with GM, Felder's does not specifically state the degree to which All Star Advertising was involved with or had knowledge of the alleged conspiracy. In this regard, the instant case runs parallel with *McCray* and *California Title*. However, it is also true that *McCray* and *California Title* are immediately distinguishable from the instant case, since Felder's has not alleged a violation of § 1 of the Sherman Act. Thus, while the facts alleged

would not warrant § 1 liability for All Star Advertising, the Court rejects Defendants' proposition that the tactic of using a single name in reference to a group of entities is impermissible (Doc. 22-1 at 21). Nevertheless, the Court finds that the amended complaint must provide more specific factual support with regard to All Star Advertising's involvement (or lack thereof) with GM, particularly if Felder's wishes to pursue the Louisiana antitrust law claim under La. R.S. 51:122.

## FELDER'S' REQUEST FOR LEAVE TO AMEND

Felder's HAS requested leave to file an amended complaint to cure any deficiencies that the Court may find. Defendants, in reply, argue that Felder's' request should be denied because it offers no insight on the grounds on which amendment is sought or how an amendment would cure any deficiencies. According to Defendants, Felder's' request for leave is a "bare request" and, therefore, it should be denied.

According to the Fifth Circuit, "a bare request in an opposition to a motion to dismiss— without any indication of the particular grounds on which the amendment is sought- does not constitute a motion [for leave to amend]." *Pension Fund v. Integrated Electrical Services, Inc.*, 497 F.3d 546, 555-56 (5th Cir. 2007) (quotation and citation omitted). However, it is also true that "district courts often afford plaintiffs at least one opportunity to cure pleading deficiencies before dismissing a case, unless it is clear that the defects are incurable or the plaintiffs advise the court that they are unwilling or unable to amend in a manner that will avoid dismissal." *Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 329 (5th Cir. 2002). The permissible reasons for denying a request to amend include "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously

allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc." *Pension Fund*, 497 F.3d at 556.

Here, Felder's is willing to amend and it does not appear that such a request would be futile. Given the sudden and drastic difference between standard OEM prices and the prices offered under the challenged pricing program, there is reason for suspicion. For instance, one particular auto part mentioned in the Complaint is normally sold by an OEM dealer, like All Star, for $228.83, but under the pricing program, dealers may offer the same part for a "bottom line price" of $119.93. This demonstrates that the program allows OEM dealers to cut pricing by nearly half for an OEM part with an aftermarket counterpart. Given the nature of antitrust suits, in which the plaintiff's access to information is often limited, the Court is inclined to grant Felder's' request for leave to amend. Cf. *Poller v. Columbia Broad. Sys., Inc.*, 368 U.S. 464, 473 (1962) ("We believe that summary procedures should be used sparingly in complex antitrust litigation where motive and intent play leading roles, the proof is largely in the hands of the alleged conspirators, and hostile witnesses thicken the plot.").

IV.

Accordingly, Defendants' Motion to Dismiss (Doc. 22) is DENIED, and Plaintiff's request for leave to amend (Doc. 25 at 22-23) is GRANTED.


Signed in Baton Rouge, Louisiana, on April 16th, 2013.


_____

**JAMES J. BRADY, DISTRICT JUDGE**
**MIDDLE DISTRICT OF LOUISIANA**