# IN THE UNITED STATES COURT OF APPEALS

## FOR THE FIFTH CIRCUIT

————————————————

No. 14-30410

————————————————

D.C. Docket No. 3:12-CV-646

United States Court of Appeals
Fifth Circuit

**FILED**

January 27, 2015

Lyle W. Cayce
Clerk

FELDER'S COLLISION PARTS, INCORPORATED,

      Plaintiff - Appellant

v.

ALL STAR ADVERTISING AGENCY, INCORPORATED; ALL STAR
CHEVROLET NORTH, L.L.C.; ALL STAR CHEVROLET, INCORPORATED;
GENERAL MOTORS, L.L.C.,

      Defendants - Appellees

Appeal from the United States District Court for the
Middle District of Louisiana, Baton Rouge

Before KING, JOLLY, and COSTA, Circuit Judges.

## J U D G M E N T

This cause was considered on the record on appeal and was argued by
counsel.

It is ordered and adjudged that the judgment of the District Court is
affirmed.

IT IS FURTHER ORDERED that plaintiff-appellant pay to defendants-
appellees the costs on appeal to be taxed by the Clerk of this Court.

Certified as a true copy and issued
as the mandate on Feb 19, 2015

Attest: *Lyle W. Cayce*

Clerk, U.S. Court of Appeals, Fifth Circuit

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

---

No. 14-30410

---

United States Court of Appeals
Fifth Circuit

**FILED**

January 27, 2015

Lyle W. Cayce
Clerk

FELDER'S COLLISION PARTS, INCORPORATED,

>  Plaintiff - Appellant

v.

ALL STAR ADVERTISING AGENCY, INCORPORATED; ALL STAR
CHEVROLET NORTH, L.L.C.; ALL STAR CHEVROLET, INCORPORATED;
GENERAL MOTORS, L.L.C.,

>  Defendants - Appellees

---

Appeal from the United States District Court
for the Middle District of Louisiana

---

Before KING, JOLLY, and COSTA, Circuit Judges.

GREGG COSTA, Circuit Judge:

It would not be an antitrust opinion without the line that the antitrust laws were designed for "the protection of competition, not competitors." *Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962). Though often included by rote, the axiom is particularly apt in this case.

The competitors are Felder's Collision Parts, Inc., a Louisiana dealer of aftermarket auto body parts that are compatible with General Motors vehicles but not manufactured by GM, and All Star, a dealer of GM-manufactured parts. Felder's filed this antitrust suit against All Star and GM alleging that GM's "Bump the Competition" program is an unlawful predatory pricing

No. 14-30410

scheme.  The program lowers the consumer price for GM-manufactured parts below the prices of equivalent "generic" auto parts manufactured by others.  It does so by providing rebates to dealers like All Star that sell GM-manufactured parts for the reduced prices.  The rebates ensure that the dealers still make a profit on these sales despite the lower price charged consumers.

The primary issue in this appeal from a dismissal of the antitrust claims is whether we consider the effect of this rebate in deciding whether Felder's can meet one of the essential elements of a predatory pricing claim: that the defendant is selling its product at a price below average variable cost.  *See Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 224 (1993); *Stearns Airport Equip. Co., Inc. v. FMC Corp.*, 170 F.3d 518, 532 (5th Cir. 1999).

## I.

There are two types of automobile parts.[1]  Original equipment manufacturer (OEM) parts are produced by the same manufacturer that created the vehicle, in this case GM, or by a submanufacturer; these parts are considered "name brand."  Aftermarket equivalent parts are non-name brand and are produced by a supplier other than the vehicle manufacturer.  OEM parts and their aftermarket equivalents are interchangeable.  But not all parts have an aftermarket counterpart; for certain parts, the only option is to purchase an OEM part.  For the collision parts that are the subject of this case, OEM parts make up about 80% of the market.  As is typical for generic products, aftermarket equivalents historically have enjoyed a significant price advantage over their brand-name counterparts.  Prior to the pricing program

---

[1] This section comes from the First Amended Complaint, which details the challenged GM plan and also includes attached exhibits obtained from GM and All Star through discovery.

No. 14-30410

at issue in this case, OEM collision parts were often priced 25% to 50% higher than aftermarket equivalents.

Motivated by the cost-conscious insurance companies that are the primary purchasers of auto body parts, GM instituted a program in 2009 to eliminate its historic price disadvantage and offer "highly competitive pricing" with aftermarket equivalents. The program, transparently named "Bump the Competition," is available only for GM parts that have an aftermarket equivalent; prices remain the same for parts with no aftermarket equivalents. A "GM Collision Conquest Calculator" determines prices. The calculator provides a dealer of OEM parts with the "bottom line price" at which they should sell the part. This price is 33% less than the prevailing market price for an aftermarket equivalent. That "bottom line price" is also below GM's list price—the price All Star and other dealers pay GM for the part on the front end. But after a dealer sells a highly discounted part under the program, it is entitled to a rebate from GM. The rebate compensates the dealer for the difference between the sale price and the price it paid GM for the part. On top of making up for that loss, GM also pays the dealer a 14% profit based on the part's original price.

An example from the complaint illustrates how the program works.[2] Prior to Bump the Competition, a dealer would have purchased a part from GM for $135.01. It would have then sold the part to a customer—usually a collision center or body shop—for $228.83, which is more than 30% above the $179 price for an aftermarket equivalent part.

Under Bump the Competition, a dealer like All Star would still pay an initial purchase price of $135.01 from GM. It would then sell the part for

_____

[2] Although Bump the Competition has been in existence since 2009, the examples Felder's provides in the complaint are not based on actual sales or transactions.

3

No. 14-30410

$119.93, 33% less than the market price for an aftermarket equivalent ($179 * .67). This sale price would also be about $15 less than the $135.01 the dealer had initially paid GM for the part. By submitting the rebate, however, the dealer would get back this $15 "loss" and would also receive a 14% profit, which for this part would be about $18.90 ($135.01 * .14).

Felder's filed this suit alleging that Bump the Competition is a predatory pricing scheme that violates federal and Louisiana antitrust laws as well as other Louisiana laws.[3] Established in 1993, Felder's is a seller of aftermarket equivalent collision parts based in Louisiana. It sells the parts to various customers including collision centers and body shops. The suit names All Star, GM, and 25 unnamed dealers of OEM parts as defendants. All Star's OEM parts distribution center opened in 2003 and is now the largest parts distribution center in Louisiana. It has $5 million in inventory and more than 50,000 square feet of space. All Star and John Doe Defendants 1-25[4] compete with Felder's to sell GM-compatible collision parts.

The district court denied Defendants' first motion to dismiss but raised a number of concerns with Felder's complaint that the court instructed Felder's to address in its amended complaint. On the issue of below-cost pricing, the district court found that Felder's failure to incorporate the rebate into All Star's price improperly dissected the transaction into pieces rather than treating it as a whole. In hopes that more information would help cure these defects, the district court also compelled Defendants to turn over documents

---

[3] The state claims are for violations of the Louisiana antitrust laws, the Louisiana Unfair Trade Practices Act, as well as a conspiracy claim for joint and solidary liability pursuant to Louisiana Civil Code article 2324.

[4] Felder's sued General Motors; All Star Automotive Group, which includes All Star Advertising Agency, Inc., All Star Chevrolet, Inc., and All Star Chevrolet North, L.L.C.; and 25 John Doe Defendants. For clarity, the All Star and John Doe Defendants are collectively referred to as All Star.

No. 14-30410

relevant to their costs and profits. With this information, Felder's amended its complaint. Defendants again moved to dismiss for failure to state a claim, asserting that the complaint lacked facts to support the alleged geographic market, below-cost pricing, and recoupment. The district court dismissed the federal antitrust claims, citing Felder's failure to adequately define the relevant geographic market and its earlier finding that Felder's did not allege below-cost pricing. The resolution of the federal claims also warranted dismissal of the state law antitrust claims, which depend on a finding of federal antitrust liability. *See S. Tool & Supply, Inc. v. Beerman Precision, Inc.*, 862 So.2d 271, 278 (La. App. 4 Cir. 11/26/03) ("Because [the Louisiana antitrust statutes] track almost verbatim Sections 1 and 2 of the Sherman Act, Louisiana courts have turned to the federal jurisprudence analyzing those parallel federal provisions for guidance.").[5] We therefore need analyze only whether Felder's has stated a claim for predatory pricing under the Sherman Act.

## II.

Predatory pricing occurs when a defendant "sacrifice[s] present revenues for the purpose of driving [a competitor] out of the market with the hope of recouping the losses through subsequent higher prices." *Int'l Air Indus., Inc. v. Am. Excelsior Co.*, 517 F.2d 714, 723 (5th Cir. 1975). Most courts analyze predatory pricing claims as "an attempt by the defendant to preserve or extend its monopoly power" under section 2 of the Sherman Act. IIIA PHILLIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW ¶ 724, at 36 (3d ed. 2008). That points to an unusual feature of this case. It is unclear which defendant

---

[5] And failure to plead a state or federal antitrust conspiracy required dismissal of the remaining solidary liability claim under Louisiana law.

No. 14-30410

is alleged to be the attempted monopolist or if they both are.[6]  The typical predatory pricing case is brought solely against the plaintiff's competitor who is allegedly selling at low prices in order to increase market share by driving the plaintiff out of the market.  *See, e.g.*, *Stearns*, 170 F.3d 518 (suit brought by manufacturer of airplane jet bridges against competitor alleging exclusionary manipulation of municipal bids and predatory pricing); *Stitt Spark Plug Co. v. Champion Spark Plug Co.*, 840 F.2d 1253 (5th Cir. 1988) (suit brought by spark plug company against other spark plug company alleging anticompetitive practices including predatory pricing); *Adjusters Replace-A-Car, Inc. v. Agency Rent-A-Car, Inc.*, 735 F.2d 884 (5th Cir. 1984) (suit by rental car company accusing competitor of employing predatory pricing in two cities in attempt to monopolize).  All Star is Felder's competitor in the sale of collision parts at the dealer level in the supply chain.  But Felder's also sued All Star's supplier, GM, and pursues conspiracy claims.  GM is the moving force behind the challenged conduct, as Bump the Competition is its program.  And the only specific allegations of market share in the complaint also target GM, mentioning its 80% share of the market for certain types of replacement parts for GM vehicles.  Indeed, it would seem that a successful predatory

---

[6] The Automotive Body Parts Association filed an amicus curiae raising the issue of monopoly leveraging in which a monopolist—in this case, GM—is able to leverage profits from goods on which it holds a monopoly to cover losses arising from the below-cost sale of another good for which it does not have a monopoly.  The amicus argues primarily that the use of average variable cost as the "appropriate measure" may be erroneous, stating that "where a monopolistic leverage is used to decrease a predator's overall costs, courts ought to consider those fixed costs which are being covered by the illegal leverage."  Amicus Br. at 7 (quoting David M. Magness, Comment, *Getting Past Summary Judgment in Predatory Pricing Cases After* American Airlines: *Will Post-Chicago Analysis Ever Prevail?*, 5 HOUS. BUS. & TAX L.J. 421, 449 (2005)).  The amicus, however, is "limited to the issue of pricing and costs and the effect that timing and monopoly leveraging may have on whether costs are classified as fixed or variable in the determination of appropriate measure of cost and variable cost."  *Id.* at 13.  It does not characterize Felder's claims as one for monopoly leveraging, and Felder's does not raise this claim and its complaint does not allege that GM prices below any measure of costs.

No. 14-30410

pricing scheme of this nature would primarily benefit GM by driving aftermarket equivalent parts from the market. But Felder's has never alleged that GM is selling parts below its costs, focusing instead on allegations that GM dealer All Star is selling parts at prices below its costs. The viability of Felder's claims thus turns on whether it can show that All Star is engaged in predatory pricing at the dealer level.

Although there is no heightened pleading standard in an antitrust case, *see Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007), we are wary of predatory pricing allegations as "mistaken inferences in [predatory pricing] cases . . . are especially costly, because they chill the very conduct the antitrust laws are designed to protect." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 594 (1986); *see also Stearns*, 170 F.3d at 527 ("The Supreme Court has expressed extreme skepticism of predatory pricing claims."). To ensure that antitrust liability is not imposed for conduct resulting in lower prices today but carrying no viable risk of supracompetitive pricing in the future, a plaintiff must prove two things. First, it must show that "the prices complained of are below an appropriate measure of its rival's costs." *Brooke Grp.*, 509 U.S. at 222 (1993). Second, it must show that the defendant has "a dangerous probability[] of recouping its investment in below-cost prices." *Id.* at 224; *see also Am. Academic Suppliers, Inc. v. Beckley-Cardy Inc.*, 922 F.2d 1317, 1319 (7th Cir. 1991) ("Consumers like lower prices. The plaintiff must therefore show that the defendant's lower prices today presage higher, monopolistic prices tomorrow."). We focus our analysis on the first requirement, given that it was one of the grounds on which the district court dismissed the case.

Low prices benefit consumers and are usually the product of the competitive marketplace that the antitrust laws are aimed at promoting. *Brooke Grp.*, 509 U.S. at 223 ("Low prices benefit consumers regardless of how

No. 14-30410

those prices are set, and so long as they are above predatory levels, they do not threaten competition." (quoting *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 340 (1990)).   The Supreme Court has thus emphasized that a predatory pricing claim should go forward only when the defendant is pricing below its costs because "the exclusionary effect of prices above a relevant measure of cost either reflects the lower cost structure of the alleged predator, and so represents competition on the merits, or is beyond the practical ability of a judicial tribunal to control without courting intolerable risks of chilling legitimate price-cutting." *Brooke Grp.*, 509 U.S. at 223 (citing AREEDA & HOVEKNKAMP ¶¶ 714.2, 714.3).

The "appropriate measure" of cost has been the subject of much scholarly and judicial debate.  *See Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 117 n.12 (1986) (citing cases and articles discussing various measures of cost). The debate is settled in our court, however, as we use average variable cost. *Stearns*, 170 F.3d at 532.   Our practice follows the landmark 1975 article *Predatory Pricing and Related Practices under Section 2 of the Sherman Act*, in which Professors Phillip Areeda and Donald F. Turner explained why "marginal-cost pricing is the economically sound division between acceptable, competitive behavior and 'below-cost' predation."[7]   88 HARV. L. REV. 697, 716. Although marginal cost should theoretically serve as the dividing line, the

---

[7] They provided the following explanation for why marginal cost is the best measure: "Under conditions of perfect competition, a firm always maximizes profits (or minimizes losses) by producing that output at which its marginal cost equals the market price."   88 HARV. L. REV. at 702.  Because rational firms attempt to maximize profits or minimize losses, a firm selling at a "shortrun profit-maximizing (or loss-minimizing) price is clearly not a predator." *Id.* at 703.  On the other hand, "a firm producing at an output where marginal cost exceeds price is selling at least part of that output at an out-of-pocket loss." *Id.* at 712. "A monopolist pricing below marginal cost should be presumed to have engaged in a predatory or exclusionary practice" because "[t]he monopolist is not only incurring private losses but wasting social resources when marginal costs exceed the value of what is produced. And pricing below marginal cost greatly increases the possibility that rivalry will be extinguished or prevented for reasons unrelated to the efficiency of the monopolist." *Id.*

No. 14-30410

article also notes that businesses rarely account for marginal cost on their books. *Id.* at 716. Average variable cost, which is more commonly accounted for, is thus a suitable "surrogate." *Id.* at 716–18; *accord* AREEDA & HOVENKAMP, *supra* ¶ 724, at 39.

Even calculating average variable cost can be time-consuming and challenging in many cases. *See Stearns*, 170 F.3d at 532–35 & 533 n.14 (discounting the plaintiff's expert because he "relied on an erroneous interpretation of the law regarding predatory pricing" by failing to mention average variable cost and did not "explain what [general and administrative expenses] represented or state that it was a variable cost"). Variable costs include "inputs like hourly labor, the cost of materials, transport, and electrical consumption at a plant." *Id.* at 532. But that complicated inquiry of defining the proper inputs does not arise here because Felder's acknowledges that its ability to show pricing below average variable cost turns on a single issue that the district court termed the "temporal debate": should the calculation account for the rebate that All Star receives from GM?

If the rebate were irrelevant as Felder's contends, then Felder's complaint would be sufficient on this issue because it alleges that "at the point of sale to body shops and collision centers, the All Star Defendants and the John Doe Defendants 1-25 sell collision parts lower than their average variable cost" and that "at the time of sale, the price of the good sold was less than the cost to All Star Defendants or the John Doe Defendants plus the costs of selling that part." The example it gives, which was described above, illustrates the basis for this contention: "At the point of sale"—that is, without taking into account the rebate it later receives—All Star would sell a part for $119.93 that it purchased from GM for $135.01.

The calculus is quite different if the rebate is considered. After the rebate, that $15 loss turns into a $19 profit.[8] The district court thought it appropriate to consider the rebate because to "find that the relevant sales by All Star are below-cost ignores the commercial realities of the transaction—specifically the fact that All Star probably would not sell at the suggested 'bottom-line' price absent GM's claim system, which allows for collection of the difference between the sales price and dealer cost, plus a 14 percent profit." *Felder's Collision Parts, Inc. v. Gen. Motors Co.*, 960 F. Supp. 2d 617, 635–36 (M.D. La. 2013).

Felder's main challenge to the district court's analysis is to argue that it improperly added the rebate amount to the price at which All Star sold the parts to its customers. In predatory pricing cases, Felder's contends, what matters for the "price" side of the equation is the price at which a product is sold in the relevant market. This argument misses the mark. For starters, we do not read the district court opinion as adding the rebate amount to All Star's sales price. Instead, it concluded that "the cost and revenue associated with a particular sale should not be dissected into pieces, but rather treated as a whole, regardless of the time associated with any discount or rebate programs."[9] *Id.* at 635 (citing *Stearns*, 170 F.3d at 533 n.15 ("[T]he fact that [the defendant] may have chosen for internal reasons or salesmanship

---

[8] Felder's allegations seem to limit All Star's costs to the purchase price of the parts from GM, without including other potentially variable costs for each unit of sale. Notably, however, Felder's assumes that All Star is making a profit on each sale after the rebate is included. And at the Rule 12 stage, we review only the allegations that a plaintiff makes; we cannot speculate about costs it may have missed. There is no allegation that All Star is pricing below average variable cost if the rebate is considered.

[9] Felder's may have gotten this impression from the district court's discussion of rebate cases, which the district court read for the proposition that "price is measured after considering any discounts or rebates." *Id.* at 635 (citing *A.A. Poultry Farms, Inc. v. Rose Acre Farms, Inc.*, 881 F.2d 1396, 1407 (7th Cir. 1989)). As discussed below, All Star is receiving the rebate as a purchaser of parts from GM, so it makes the most sense to read the district court's opinion as viewing the rebate as a reduction in the cost of acquiring the parts.

No. 14-30410

purposes to shift costs in this manner is not objectionable without a showing that the project as a whole was not priced above its variable cost.")).  We turn then to that fundamental question: not the side of the ledger on which the rebate should be placed, but whether it should be considered at all.

We agree with the district court that the rebate should be considered in the predatory pricing analysis.  The price versus cost comparison focuses on whether the money flowing in for a particular transaction exceeds the money flowing out.  The rebate undoubtedly affects that bottom line for All Star by guaranteeing that it makes a profit on any Bump the Competition sale.  That undisputed fact resolves the case, as a "firm that is selling at a shortrun profit-maximizing (or loss-minimizing) price is clearly not a predator."  Areeda & Turner, 88 HARV. L. REV at 703.

Felder's "freeze frame" approach of comparing price and cost as they exist only on the day of the sale ignores the economic realities that govern antitrust analysis.  *See United States v. Concentrated Phosphate Exp. Ass'n*, 393 U.S. 199, 209 (1968) ("In interpreting the antitrust laws, . . . [w]e must look at the economic reality of the relevant transactions."); *Sec. Tire & Rubber Co. v. Gates Rubber Co.*, 598 F.2d 962, 965–66 (5th Cir. 1979) ("There usually is no substitute for a careful analysis of the economic realities presented by the facts of a given case in light of the underlying purpose of the relevant antitrust statute.").  Although All Star's profitability is what ultimately matters, it makes sense conceptually to view the rebate as a reduction in All Star's cost of purchasing the parts from GM.  In purchasing the parts from GM, All Star is a consumer.  As it does for any consumer, a rebate reduces All Star's cost of acquiring the parts.  So although All Star would initially pay $135.01 for the example part, the rebate would reduce the price to $101.03.

Felder's conceded at oral argument that if GM had sold the part to All Star at this lower price up front, then Felder's would have no case.  The

11

No. 14-30410

concession was an obvious one because in that scenario, All Star would be selling the part for more than the $101.13 it would have paid GM (and recall that there is no allegation that GM's price is below its average variable cost). Different timing does not change that analysis.  A firm's costs related to a transaction are not set in stone on the day of the sale.  *See Fruitvale Canning Co.*, 52 F.T.C. 1504, 1520 (1956) ("It is the actual amount paid by the purchaser to the seller after taking into consideration all discounts, rebates, or other allowances with which we are concerned here."), *cited in A.A. Poultry*, 881 F.2d at 1407.

Any consumer would consider a rebate as a reduction in cost, even if the consumer were "refunded" months after the actual sale for the higher price. Just ask the purchaser of a new "$600" cellphone for which a $300 rebate were available.  Perhaps Felder's position in this case stems from the extra step in the transaction; All Star gets a rebate from GM on a product that All Star passes on to its consumers.  But any confusion resulting from that extra step is eliminated by considering an example involving a different cost input: If All Star received a rebate on the costs of shipping the collision parts, is there any doubt that rebate would reduce its shipping costs even though the discount would not be realized the day the shipping would take place?  An analogy used in a prior predatory pricing case also supports rejecting Felder's isolated view of the transaction.  We have noted that when "a company has a 'buy one, get one free' promotion, it would be incorrect to look at the nominal price of the 'free' product—zero—and infer predation from this fact."  *Stearns*, 170 F.3d at 533 n.15.  The economic reality in that situation is that the two products are both being sold at a 50% discount.  The undisputed reality in this case is that All Star is making money on its sale of parts after it receives the GM rebate. And with respect to GM, Felder's does not allege that it is selling its parts below average variable cost, whether the rebate is considered or not.

12

Although it has remained in business during the five years in which Bump the Competition has been in effect,[10] Felder's no doubt is having a tougher time selling aftermarket equivalent parts for GM vehicles in light of GM's decision to reduce the price of its parts at the dealer level by large percentages (almost a 50% reduction from $228.33 to $119.93 for the example part). But antitrust law welcomes those lower prices for consumers of collision parts so long as neither GM nor its dealers is selling parts at below-cost levels. *See Matsushita*, 475 U.S. at 594 ("[C]utting prices in order to increase business often is the very essence of competition."). Because the district court properly concluded that the rebate GM provides its dealers should be considered in making that determination, its judgment is AFFIRMED.

---

[10] Felder's makes no mention of whether it sells parts other than GM-equivalent parts, which is relevant to whether Felder's can stay in business in spite of All Star's lower prices.

# *United States Court of Appeals*

### FIFTH CIRCUIT
### OFFICE OF THE CLERK

**LYLE W. CAYCE**
**CLERK**

**TEL. 504-310-7700**
**600 S. MAESTRI PLACE**
**NEW ORLEANS, LA 70130**

February 19, 2015

Mr. Michael L. McConnell
U.S. District Court, Middle District of Louisiana
777 Florida Street
Room 139
Baton Rouge, LA 70801

        No. 14-30410    Felder's Collision Parts, Inc. v. General
Motors Company, et al
                USDC No. 3:12-CV-646

Dear Mr. McConnell,

Enclosed is a copy of the judgment issued as the mandate and a
copy of the court's opinion.

                        Sincerely,

                        LYLE W. CAYCE, Clerk

                        By: _____
                        Dawn D. Victoriano, Deputy Clerk
                        504-310-7717

cc:  Mr. Ryan Duane Adams
     Mr. Tarak Anada
     Mr. Harvey Sylvanous Bartlett III
     Ms. Darnell Bludworth
     Mr. Thomas Alcade Casey Jr.
     Mr. Mark Aaron Cunningham
     Mr. James M. Garner
     Mr. Peter L. Hilbert Jr.
     Mr. Gladstone Nathaniel Jones III
     Mr. Kevin Michael McGlone
     Mr. Michael W. McKay
     Mr. Robert Glenn Oake Jr.
     Mr. David G. Radlauer
     Ms. Lynn Elizabeth Swanson